IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **Criminal No. 3:09CR425-001** |
| | ) | |
| MICHAEL DAVID MITCHELL, | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION WITH RESPECT TO SENTENCING
FACTORS AND SENTENCING MEMORANDUM
OF DEFENDANT MICHAEL DAVID MITCHELL**

COMES NOW, the defendant Michael David Mitchell, by counsel, and pursuant to 18 U.S.C. § 3553(a), states his position at sentencing.

*Introduction*

Michael David Mitchell will appear before this Court on March 18, 2010 for sentencing on his plea of guilty to one count of theft of trade secrets in violation of 18 U.S.C. § 1832 and one count of obstruction of justice in violation of 18 U.S.C. § 1512. In the Plea Agreement entered by the parties, the Government recommends a sentence of 16 months incarceration. Mr. Mitchell asks the Court to follow this recommendation, which varies from the suggested Guidelines sentence of 30-37 months. He further asks that the Court vary from the Guidelines' Zone D designation and allow him to serve a portion of the 16 month sentence on home detention because such a sentence is sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

*Position with Respect to Sentencing Factors*

The United States Probation Officer calculated the loss amount in this case at $220,000, representing an estimate of the legal fees expended by E.I. du Pont de

Nemours ("Dupont") in investigating this matter. Mr. Mitchell objects to the use of this sentencing factor to the extent that it includes legal fees incurred to assist the Government in its criminal investigation of this case. Pursuant to USSG § 2B1.1, application note 3(D)(ii), such costs should be excluded from the calculation of loss. Counsel has recently been in contact with Dupont representatives, who have reviewed their legal bills and will provide a revised breakdown of their legal fees to apportion between civil investigative costs and those incurred to support the criminal case. Counsel will provide this to the Court in a supplemental filing as soon as possible.

## *ARGUMENT*

The United States Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220 (2005), and sentencing courts "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596 (2007) (citing *Rita v. United States*, 127 S. Ct. 2456 (2007)). Rather, a sentencing court must make an "individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. Above all, a court's final determination of a sentence must reflect "§ 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in 3553(a)(2)," namely, retribution, deterrence, incapacitation, and rehabilitation. *See Kimbrough v. United States*, 128 S. Ct. 558, 575 (2007). *Rita* and *Kimbrough* grant sentencing courts the latitude to disagree with the guidelines' recommended sentence in any particular case and allow for an individualized sentence based on a contrary view of what is appropriate under § 3553(a). This includes the freedom to disagree with "policy decisions" of Congress or the Sentencing Commission that are contained in the guidelines. As the Supreme Court noted, "[a]s far as the law is

concerned, the judge could disregard the Guidelines . . . ." *Rita*, 127 S. Ct. at 2466. In the present case, a sentence below the Guidelines is appropriate based upon consideration of the 3553(a) factors.

### *Section 3553(a)(1) Offender Characteristics*

The first set of factors a sentencing court must consider is "the nature and circumstances of the offense and the history and character of the defendant." Mr. Mitchell's actions in this case represent a dramatic and aberrant departure from his otherwise good character. He graduated from Hempfield Senior High School in Lancaster, Pennsylvania in 1975, where he participated in track, cross country and a number of clubs; academically, he was a National Merit Scholarship commended student. PSI, ¶ 41. Mr. Mitchell then entered the United States Coast Guard Academy, where he remained for almost three years before voluntarily withdrawing to pursue an engineering degree at Pennsylvania State University. PSI, ¶ 34. Through diligence and hard work, Mr. Mitchell earned both a bachelor's and master's degree in chemical engineering in 1980 and 1982 respectively. *Id.*

With this background, Mr. Mitchell obtained employment as a chemical engineer at Dupont's Richmond area Spruance Plant in June, 1982. PSI, ¶ 45. He worked at Dupont, successfully and without incident, for almost 24 years, progressing from engineering into sales and, along the way, earning a master's degree in business administration in 1992. Unfortunately, in 2006 Mr. Mitchell was terminated from Dupont following disagreements with his superiors over management decisions.

On a personal level, Mr. Mitchell was married in 1983 and, along with his wife, raised a daughter who is now a 25 year old chemical engineering graduate student at

Clemson University. PSI, ¶ 36. While divorced from his wife in 2002, Mr. Mitchell has been in a committed relationship with Cynthia Harris for the past several years.

### *Section 3553(a)(1) Offense Characteristics*

Following his termination from Dupont, Mr. Mitchell desired to remain employed in his long-time area of expertise, aramid fiber technology and sales. In furtherance of that goal, he formed a company called Aramid Fiber Systems, LLC, ("AFS"), to consult with other companies producing aramid fiber products. PSI, ¶ 44. In April 2007, AFS entered into a consulting contract with Kolon Industries, Inc., ("Kolon"), a Korean producer of aramid fiber products, primarily to act as a sales agent in the United States. PSI, ¶ 5.

Soon after entering into the consulting agreement, Mr. Mitchell's Kolon contacts began pressing him for technology related Dupont information. PSI, ¶ 6. While Mr. Mitchell resisted these entreaties, he did attempt to put Kolon in touch with several retired Dupont engineers whom he thought could consult directly with Kolon; it was Mr. Mitchell's belief that these individuals could provide expertise regarding Kolon's manufacturing process without revealing Dupont proprietary information. None of the persons contacted by Mr. Mitchell, however, ever consulted with Kolon.

In addition, when Mr. Mitchell left Dupont, he did not delete a number of Dupont documents from his laptop computer, primarily relating to sales and production, rather than manufacturing technology. While he did nothing with almost any of this information, on or about September 5, 2007, Mr. Mitchell e-mailed a portion of a spreadsheet called the Denier Economic Spreadsheet to Kolon. PSI, ¶ 8. While unconnected to the bulk of the information in the full spreadsheet, the limited e-mailed

portion did contain historical Dupont proprietary information, and Mr. Mitchell's efforts to simply consult and earn a living in his area of expertise went awry. Importantly, however, no evidence shows that the e-mailed information provided any significant economic value for Kolon.

Following the search of his house by federal agents on March 12, 2008, but before being charged with any crime, Mr. Mitchell – signaling his acceptance of responsibility for his actions – agreed to cooperate with the Government in their continued investigation of Kolon. In furtherance of that goal and as supervised by federal agents, Mr. Mitchell engaged in a number of recorded telephone calls and meetings with Kolon officials. These efforts ultimately resulted in an FBI controlled and secretly recorded meeting in Richmond on August 26, 2008, where Kolon officials expressed their desire to obtain highly sensitive and proprietary Dupont technology. PSI, ¶ 10-11. Between August and November, 2008, despite a number of attempts by Mr. Mitchell to close the deal, Kolon took no additional steps towards obtaining the proffered information. The FBI retrieved its telephone recorder from Mr. Mitchell, who then believed the investigation was being closed. It was at that point that Mr. Mitchell e-mailed Kolon in an attempt to be paid under his consulting contract which had been recently terminated by Kolon and disclosed that the meeting in Richmond had been recorded. Mr. Mitchell's rash action, whether wittingly or unwittingly, obstructed the FBI investigation into Kolon, which had not officially been closed.

More recently, Dupont has learned through discovery in its civil action against Kolon, that Kolon may have surreptitiously, and unbeknownst to Mr. Mitchell, copied the

5

contents of Mr. Mitchell's laptop computer while he was on a business trip to Korea.[1] In connection with this, Mr. Mitchell has continued to cooperate with Dupont in investigating this matter to assist in the return of their technology.

As the foregoing demonstrates, Mr. Mitchell's illegal actions represent a brief and uncharacteristic time in his life. He has no prior criminal record, he has a history of hard work and success at school and on the job; he started a family, raised a child and otherwise has contributed to his community. To the extent that he made bad decisions in this matter, he quickly accepted responsibility and has taken efforts to correct the wrong by cooperating with the Government and Dupont. It is especially unfortunate that he disclosed the taping of the meeting with Kolon in the waning days of the Government's investigation because it has the double consequence of adding points to his Guidelines calculation and causes the Government to refuse to give him any cooperation credit pursuant to Rule 35(b) or USSG § 5K.

*Factor (a)(2) The Need for the Sentence Imposed*:

Factor (a)(2) instructs the Court to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to deter crime, to protect the public from the defendant and to provide the defendant with needed vocational, medical or other treatment in the most effective manner. In this case, a sentence of 16 months incarceration, with a portion served through probation and/or home detention will provide a just punishment in this case. Home detention and supervised probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive. The Supreme

---

[1] *Upon information and belief and supported by forensic evidenc, neither the government nor Dupont believe that Mitchell was an active participant in the copying of the contents of Mitchell's laptop computer.*

6

Court in *Gall* agreed with United States District Judge Pratt that probation is a

" 'substantial restriction of freedom,' " 128 S.Ct. at 595, stating:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. App. 109.

*Id.* at 595-96 (footnote omitted). In Mr. Mitchell's case, a sentence of 16 months, with a portion on home detention would be significantly more restrictive than the sentence of probation in *Gall*. If he were placed on home electronic monitoring, Mr. Mitchell would be restricted to his house, with even the yard being off limits. His home would be subjected to intrusive searches and he would have significant reporting requirements. Of course, he would be solely responsible for paying the costs of his home electronic monitoring. He would also be subject to the full panoply of penalties including incarceration in a penal institution if he breaches the terms of his home detention.

A sentence of home detention is also appropriate where it punishes Mr. Mitchell for his actions and serves the interests of deterrence and protection of the public from any further crimes by the defendant. In this case, there is little likelihood of Mr. Mitchell re-offending. He has no criminal history, a track record of employment and education and a

deep remorse for his actions. Indeed, the Sentencing Commission own statistics support the proposition that Mr. Mitchell will not recidivate. In a White Paper entitled *Sentencing Options under the Guidelines* (Nov. 1996), (*see* ttp//rashkind.com./alternatives/dir_00/USSC_sentencingoptions.pdf), the Commission found that the recidivism rate for federal violators placed on probation or home detention was historically very low, with only 2.7% of offenders being charged with new offenses. Similarly, in *Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines*, May 2004, the Sentencing Commission found that individuals with zero criminal history points (such as Mr. Mitchell) have the statistically lowest recidivism rates – just over 10% overall, with recidivism being defined to include a new conviction, an arrest without a new conviction and a violation of probation or supervised release. The Commission further found that factors such as an older age at the time of sentencing, employment during the year prior to sentencing, educational attainment, intact marital status, lack of illicit drug use and a sentence of probation or home detention instead of incarceration all were strong indicators against recidivism.

      In Mr. Mitchell's case, a sentence of 16 months, with a component of home detention will protect the public and deter criminal conduct. He meets all the characteristics of an individual who is unlikely to recidivate. He has zero criminal history points, is 52 years old, has always been actively employed, is well educated and has no history, beyond youthful experimentation, of the use of illicit substances.

      Finally, a sentence of incarceration is not necessary to meet the sentencing goals of providing medical, vocational or other treatment to Mr. Mitchell.

*The Government's Recommendation*

The Government recommends pursuant to FRCrP 11(c)(1)(B) that Mr. Mitchell be sentenced to a term of 16 months. This recommendation is reasonable and meets the goals of 3553(a). It also reflects the practical difficulties faced in this case. First, the calculation of any § 2B1.1 loss is extremely difficult. At present, no data or evidence suggests that the portion of the denier economics spreadsheet provided by Mr. Mitchell to Kolon represented any economic gain to Kolon. Further, Dupont's value (the loss) of the data contained in the spreadsheet portion is not easily calculable because it relates primarily to production and sales estimates rather than some kind of manufacturing technology or a chemical formula or recipe for which development costs can be calculated. Second, the 16 month recommendation takes into consideration a particularly thorny search warrant issue confronted by the Government, in which the cross-reference on the face of the warrant to an attachment listing the things to be seized was faulty. The result was a potentially invalid warrant that failed, on its face, to list the items authorized to be seized from Mr. Mitchell's house. Under these circumstances, and for the reasons outlined above, Mr. Mitchell asserts that the Government's recommendation is reasonable and should be adopted by the Court, with the additional modification that the sentence be served partly on home incarceration.

**CONCLUSION**

For the foregoing reasons, Mr. Mitchell respectfully requests that this Court sentence him to 16 months with a portion to be served on through supervised probation and home detention. Such a sentence is sufficient, but not greater than necessary to meet the sentencing goals set forth in 18 U.S.C. § 3553(a), and provides an individualized

sentence that both punishes Mr. Mitchell for his actions but is consistent with similarly situated defendants.

        Respectfully submitted,

        MICHAEL DAVID MITCHELL

        By: _____/s/_____
            William J. Dinkin
            Va. Bar No. 31198
            Attorney for Michael David Mitchell
            Dinkin & Purnell, PLLC
            One East Cary Street, Suite 201
            Richmond, VA 23219
            Phone: (804) 644-2728
            Fax: (804) 644-6553
            wjdinkin@dinkinandpurnell.com

CERTIFICATE

I hereby certify that on the 8th day of March, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

    Brian R. Hood, AUSA
    Office of the U. S. Attorney
    600 East Main Street, Suite1800
    Richmond, Virginia 23219
    (804) 819-5400
    (804) 771-2316 fax

and by electronic mail and United States mail to:

    David S. Simon
    United States Probation Officer
    600 E. Main Street

Suite 2110
Richmond, VA 23219

_____/s/_____
William J. Dinkin
Va. Bar No. 31198
Attorney for Michael D. Mitchell
Dinkin & Purnell, PLLC
One East Cary Street, Suite 201
Richmond, VA 23219
Phone: (804) 644-2728
Fax: (804) 644-6553
wjdinkin@dinkinandpurnell.com