IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:09-cr-00425-JRS |
| | ) | |
| MICHAEL DAVID MITCHELL, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

# GOVERNMENT'S POSITION WITH RESPECT TO DEFENDANT'S SENTENCING FACTORS

The United States of America, by and through its attorneys, Neil H. MacBride, United States Attorney for the Eastern District of Virginia, and Brian R. Hood, Assistant United States Attorney, hereby submits its position with respect to defendant's sentencing factors. The United States has no objection to the Presentence Investigation Report, which in MITCHELL's case establishes a guideline range of 30-37 months. For the reasons set forth below, however, and consistent with the Plea Agreement in this case, the Government recommends that the Court impose a sentence of 16 months of incarceration coupled with an appropriate fine and restitution.

**I.    Case Summary**

    A.    Introduction and Background

MICHAEL DAVID MITCHELL was employed as an engineer and salesperson for more than twenty-five years at the Richmond-based Spruance Plant owned and operated by E. I. du Pont de Nemours and Company (DuPont). DuPont is a multinational, science-based manufacturer that provides a wide range of products and services. One such product is Kevlar®, which is DuPont's registered trademark for a very light, very strong synthetic fiber that is spun

1

into ropes or fabric sheets that can be used as such, or as an ingredient in composite material components. Kevlar® belongs to a class of synthetic polymer fibers known as aramids, which exhibit high strength and resistance to heat. It is used in many applications, including the manufacture of aerospace components, fiber optic cables, brake pads, protective clothing and body armor. DuPont produces Kevlar® in a variety of fiber sizes, known as denier, which is a term used to describe the weight per unit length (linear density) of a continuous filament or yarn. Many aspects of the Kevlar® manufacturing process are very sensitive and proprietary, and are treated by the company as trade secrets.

For most of his career at DuPont, MITCHELL's area of specialization related to Nomex®, which is another DuPont aramid fiber product. MITCHELL's final position at DuPont involved sales and marketing of Kevlar®. During his last few years at DuPont, MITCHELL had become disgruntled, and had had multiple run-ins with management. Ultimately DuPont terminated his employment on February 6, 2006, for performance reasons. Upon his termination, DuPont officials reminded MITCHELL of the nondisclosure provisions of his employment contract. DuPont personnel also demanded, consistent with company policy, that MITCHELL return any proprietary information, in any form, that was in his possession. MITCHELL signed an Employment Termination Statement affirming—falsely, as it turns out— that he had returned all documents, and acknowledging his signed Employee Agreement, which provided that he would not use or divulge at any time any secret or confidential information that was the property of DuPont.

    B.  <u>Theft of Trade Secrets</u>

About two weeks after being fired, MITCHELL met with a U.S.-based representative of

2

Kolon Industries, Inc. (Kolon). Kolon is a Korean company that makes a product named Heracron®, which competes in the market with DuPont's Kevlar® for use in a number of applications. During this and subsequent contacts with Kolon officials, MITCHELL touted his understanding of both the technology and marketing considerations associated with aramid fibers like Kevlar® and Heracron®. Approximately a year later, in March 2007, MITCHELL traveled to Korea and met with Kolon officials about becoming a paid consultant for Kolon. In April 2007, MITCHELL entered into a consulting contract with Kolon, the purpose of which was for MITCHELL to provide assistance to Kolon relating to the production and marketing of Heracron® and other aramid fibers.

On September 5, 2007, in response to questions from his new employer, MITCHELL emailed much of the contents of a DuPont proprietary spreadsheet document entitled "Denier Economics" to an official with Kolon. The Denier Economics spreadsheet contained highly sensitive business information related to DuPont's production capacity for Kevlar® yarn in a variety of denier types. Included in the information for each denier type were specific figures relating to annual production, unit capacity, spin speeds, and several factors relating to line efficiency (such as percentage yield and percentage up time). The Denier Economics spreadsheet was closely held and distributed to a small number of DuPont personnel on a need-to-know basis only. (MITCHELL had legitimately obtained a copy while he was employed in Kevlar® sales so that he could better perform his sales duties.) The Denier Economics spreadsheet constituted a "trade secret" under 18 U.S.C. § 1839(3), and received protections from DuPont consistent with its value to the company.

3

### C. Mitchell's Cooperation with Investigators

On March 12, 2008, following a several month undercover investigation, special agents with the FBI and Department of Commerce executed a federal search warrant on MITCHELL's house, seizing documents and multiple computers. Forensic analysis of the defendant's computers revealed hundreds of pages of DuPont proprietary documents, along with the evidence of the above-referenced Denier Economics email.

Following the execution of the search warrant, MITCHELL agreed to become a cooperator for the government during its ongoing investigation relating to possible attempted theft of trade secrets and violations of export control laws. Under the direction and supervision of federal investigators, MITCHELL made numerous recorded telephone conversations and exchanged emails with Kolon employees. On several occasions MITCHELL specifically informed his direct supervisor at Kolon that the technical information they sought, which related to the details of polymerization and spinning of Kevlar®, involved confidential, proprietary "trade secrets" owned by DuPont. MITCHELL warned the Kolon official of the possible legal consequences, including civil suits and criminal prosecution, to everyone involved should they be discovered by DuPont or law enforcement authorities. MITCHELL agreed to put Kolon officials in contact with a "disgruntled" senior scientist with DuPont, whom he had supposedly recently recruited, who could provide them with the information they sought.

On August 26, 2008, MITCHELL, along with another cooperator playing the role of the disgruntled DuPont senior scientist, met with three Kolon employees in a room at the Doubletree Hotel near the Richmond International airport. The meeting was conducted under the supervision of federal agents, who recorded it on audio and videotape. During the hotel meeting

4

the cooperator demonstrated his engineering bona fides by answering several technical questions from the Kolon employees regarding the Kevlar® production process. The cooperator stated his willingness to assist Kolon, but emphasized that the information they sought was highly sensitive "trade secret" information owned by DuPont, and that the need for secrecy was critical. The cooperator noted that the price for the information they sought would be commensurate with its sensitivity and value. The Kolon officials appeared pleased with the meeting, and upon its conclusion spoke of following-up to discuss the matter further.

      D.      Obstruction of Justice

Several months passed without a follow-up meeting occurring with Kolon officials regarding the discussion that took place in the Doubletree Hotel. During this time MITCHELL had become embroiled in a pay dispute with Kolon officials. On November 25, 2008, MITCHELL sent an email to several Kolon employees. In that email, which the defendant sent without the knowledge or permission of investigators, MITCHELL told Kolon employees that he had recorded the meeting at the Doubletree Hotel, and that if Kolon did not pay him $20,000 in additional salary he would turn over the tape to DuPont and government authorities.

Unaware of MITCHELL's actions, the Government continued to investigate Kolon officials after the defendant sent his email on November 25, 2008. That investigation included an attempt by the "disgruntled" senior scientist to make contact with Kolon officials for follow-up discussions relating to information they sought during the Doubletree Hotel meeting.

      E.      DuPont's Legal Expenses in Response to Defendant's Actions

As discussed more fully below, determining the value of the DuPont's Denier Economics trade secret information is not a simple and straightforward proposition. What is relatively

5

simple and straightforward to determine, however, is the amount of money DuPont spent on legal expenses as a result of MITCHELL's crimes. Limiting those legal expenses to the time period following the discovery of MITCHELL's actions and going up until February 2009, when DuPont filed a civil complaint against Kolon, DuPont's losses include: $104,993.10 for legal services directly related to MITCHELL; $55,684.00 for legal services directly related to civil litigation against Kolon; and $112,377.00 for services related to both MITCHELL and Kolon that are inseparable and cannot be apportioned between the two.

One should note here that the Sentencing Guidelines exclude certain losses in calculating relevant conduct, including:

> Costs to the government of, and costs incurred by the victims *primarily to aid the government in*, the prosecution and criminal investigation of an offense.

USSG §2B1.1, comment (n.3(D)(ii)) (emphasis added). Even so, the government understands that these legal fees were not limited to primarily aiding the government's investigation and prosecution of MITCHELL. Indeed, most if not all of the legal fees were equally applicable to civil litigation contemplated by DuPont against MITCHELL and Kolon. The Guidelines thus permit consideration of these legal fees in assessing relevant conduct. Importantly, because of the complexity involved in calculating the value of the trade secrets in question, DuPont's legal expenses merely served as a proxy figure for approximating relevant conduct. And to be sure, those fees were just one of several factors the Government considered in determining its recommended sentence for the defendant.

## II. Sentencing Analysis Since *United States v. Booker*.

In *United States v. Booker,* 543 U.S. 220 (2005), the Supreme Court held that mandatory imposition of sentences derived from the Federal Sentencing Guidelines, in which a defendant's

6

sentence could be raised based on factors that were neither admitted by the defendant during his guilty plea nor found by a jury beyond a reasonable doubt, violated a defendant's Sixth Amendment right to a jury trial. The Court further held that district courts, while not bound to apply the Guidelines, must consult them and take them into account when sentencing, as well as the factors listed in 18 U.S.C. §3553. *Id.* at 265.

In *United States v. Moreland*, 437 F.3d 424 (4th Cir. 2006), the Fourth Circuit described an analytical approach district courts must adhere to in determining an appropriate sentence based on the now advisory Sentencing Guidelines and § 3553(a) factors. The now familiar *Moreland* approach requires that a district court: 1) correctly determine the applicable guideline range; 2) assess whether the guideline range satisfies the § 3553(a) factors; 3) consider any appropriate departures under the Guidelines and the case law that might also be necessary; and, finally, 4) consider, and explain, a variance to a non-guideline sentence if such a variance is still required to satisfy the factors in § 3553(a). *Moreland*, 437 F.3d at 432.

18 U.S.C. §3553(a) states that, in determining a particular sentence to be imposed, the Court shall consider:

(1) the nature and circumstances of the offense, and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct;
 (C) to protect the public from further crimes for the defendant; and
 (D) to provide the defendant with needed educational or vocational training; medical care, or other correctional treatment in the most effective manner.

### III. Factors Under 18 U.S.C. §3553(a)(1)

#### A. Nature and Circumstances of the Offense

The defendant, MICHAEL DAVID MITCHELL, retaliated against his former employer, DuPont, and provided highly valuable business trade secret information to DuPont's competitor. These business trade secrets, the Denier Economics, provided Kolon with a window into the previously secret production capacities and efficiencies of DuPont's various lines of Kevlar production. While difficult at this point to value, the Denier Economics information clearly had considerable economic worth because it was not generally known to the public or readily accessible by proper means.

There are a number of ways a trade secret might be valued, depending on the secret. Straightforward examples include determining the trade secret owner's research and development costs, the amount the defendant paid for the trade secret, or the amount the defendant sold or tried to sell the trade secret to a third party. A similarly clear-cut valuation method, if appropriate under a given set of facts, might be a reasonable licensing or royalty fee for the proprietary information. More complicated approaches to valuation include assessing the amount for which similar trade secret information has been sold in the open market (such as the merger/acquisition price for the trade secret), or determining the fair market value of the business or product line that could be infringed upon by a competitor with access to the trade secret.

Calculating trade secret value in this case is not a basic proposition. Most of the above approaches are inapplicable to the nature of trade secret that was compromised here. The methodology that fits best is the last one, *i.e.,* determining the fair market value of the business or product line that could be infringed upon by a competitor with access to the trade secret. Even

8

this approach has its limitations, however, because it is not yet fully known in what respects and for what purposes Kolon may have used the Denier Economics information. The precise extent of harm caused to DuPont is thus not known, and might not be known until months of civil litigation have transpired.

But what is known is that Kolon could use the Denier Economics trade secrets to improve, both technically and economically, its own production of Heracron® without expending the time and resources DuPont has invested over the years in improving production of Kevlar. Kolon could also use the information to develop customer strategies and target DuPont customers in ways that would have otherwise been unknown to Kolon. Put another way, by using specific information such as DuPont's unit capacity, spin speeds, percentage yield and percentage up time for various denier lines of Kevlar, Kolon could identify potential vulnerabilities in DuPont's Kevlar production and marketing and further devise strategies aimed at capturing some of the Kevlar market. As already noted, the government does not know what use, if any, Kolon made of the compromised trade secret. Even so, were Kolon to fully exploit the Denier Economics information to short-cut the development of its products or misappropriate relationships with DuPont customers, the value of that information would easily be in the millions of dollars.

Given the uncertain and contingent question of trade secret valuation in this case, the government sought other measures of relevant conduct that, while admittedly serving as proxies for trade secret value, could nonetheless provide a principled basis for calculating the sentencing guidelines here. The one readily determinable measure was the legal fees DuPont expended in responding internally to MITCHELL's conduct and preparing for civil action against both

9

MITHCELL and Kolon. Using a loss figure of just over $200,000, and dual two-point enhancements for obstruction of justice and abuse of trust, yields a guideline range of 30-37 months.

Of course, this guideline range is admittedly a bit artificial given the nature of the case. As such, it was just a starting point in attempting to determine an appropriate sentencing recommendation. The government also considered other factors, including the prospect of extended pretrial litigation and the impact such litigation would have on the victim. After consulting with the victim, DuPont, and considering the Sentencing Guidelines and all the § 3553(a) factors, the United States determined that a recommended sentence of 16 months was sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

    B.  History and Characteristics of the Defendant

     (1) *Criminal History*

The defendant does not have any prior criminal convictions, as noted in the Presentence Report.

     (2) *Personal History And Characteristics*

The personal history and characteristics of the defendant reveal a highly educated person who was motivated by both profit and vengefulness. MITCHELL could have put his considerable education, training and experience in the field of aramid fibers to use by providing legitimate consulting services to Kolon. After all, MITCHELL had only signed a nondisclosure agreement; he had not signed a noncompete agreement. Without revealing any DuPont proprietary information he could have leveraged his years of experience to assist Kolon's efforts

in marketing Heracron® to customers in the United States. Instead the defendant chose to deliver sensitive DuPont trade secret information to DuPont's competitor in an apparent effort to retaliate against DuPont for terminating his employment[1] and ingratiate himself with his new employer.

The profit and retaliation motives appear to blend with the defendant. As noted earlier, MITCHELL compromised any remaining chance the government had of continuing its covert investigation of Kolon officials when he emailed his extortion demand on November 25, 2008. In that email, MITCHELL demanded $20,000 in salary for November, December, and January, which presumably were the remaining months on the defendant's consulting contract with Kolon that Kolon had terminated earlier in November 2008. It does not appear that MITCHELL was financially desperate when he made his demand: as reflected in the PSR, the defendant's net worth is $1,273,429, of which $925,009 is liquid.

Vindictiveness and greed dovetail into a third characteristic of MITCHELL's, *i.e.,* his disregard for conforming his conduct to the law, rules, commitments and obligations.

---

[1] As reflected in paragraph 41 of the search warrant affidavit, case number 3:08MS31, dated March 10, 2008, MITCHELL's animosity toward DuPont had been simmering for some time:

> During his employment at DuPont, MITCHELL on several occasions told a co-worker (hereafter referred to as "CS1"), that he had copies of DuPont business documents at home and he would get a job with a competitor. According to CS1, MITCHELL made these statements as far back as two years prior to MITCHELL's termination from DuPont. CS1's impression was that the data was customer and cost plans based on MITCHELL's job with DuPont at the time he made those statements. CS1 told your affiant that he/she truly believed MITCHELL would take his knowledge and any DuPont documents he possessed to a competitor to do harm to DuPont. CS1 expressed these concerns to DuPont Management after MITCHELL was terminated. Another DuPont employee (hereafter referred to as CS2) stated that he/she recalled MITCHELL making disgruntled employee type statements such as "he would be better off doing what he was doing at DuPont somewhere else because his work wasn't appreciated by DuPont."

MITHCELL, who is both educated and sophisticated, in all likelihood knew, and clearly should have known, that his conduct in this case could amount to a violation of federal law. Beyond that, there can be no doubt that MITCHELL knew his conduct here breached the nondisclosure agreement he had DuPont. Topping it all off, MITCHELL knowingly and intentionally defied explicit instructions given to him by federal investigators, to which he had agreed, that he would not commit any crimes while cooperating with the government (*i.e.,* extortion) and that he would not have any unapproved contact with Kolon officials.

In considering his personal history and characteristics, it is MITCHELL's disregard for the law, rules, commitments and obligations that argues most strongly for a period of incarceration. Imposing a sentence of 16 months' incarceration, coupled with an appropriate fine, would satisfactorily address all the factors set forth in §3553(a)(1).

**IV. Factors Under 18 U.S.C. §3553(a)(2)**

    A.    <u>Seriousness of the Offense</u>

There can be no doubt that MITCHELL's offense is serious. Based on his conduct and his plea of guilty, MITCHELL has been convicted of Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a)(1) (Count One), and Obstruction of Justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two). The Economic Espionage Act of 1996 (which included 18 U.S.C. § 1832 among its provisions) was enacted in part to protect our country's economic and national security interests. As the House Report explained:

> For many years federal law has protected intellectual property through the patent and copyright laws. With this legislation, Congress will extend vital federal protection to another form of proprietary economic information - trade secrets. There can be no question that the development of proprietary economic information is an integral part of America's economic well-being. Moreover, the nation's economic interests are a part of its national security interests. Thus,

> threats to the nation's economic interest are threats to the nation's vital security interests.

Rep. No. 788, 104th Cong., 2d Sess. 4 (1996).

These broad considerations of our country's need to protect intellectual property rights, paired with the already elaborated impact this case has specifically had on DuPont, create a clear picture of the seriousness of economic espionage. When one also considers the damage MITCHELL did in obstructing the government's investigation of Kolon, the seriousness of the defendant's conduct is beyond dispute. A 16 month sentence of incarceration, combined with an appropriate fine and restitution, would adequately reflect the seriousness of MITCHELL's conduct, and promote respect for the law he violated.

      B.    <u>Need to Deter Future Criminal Conduct</u>

Sentencing MITCHELL to the recommended sentence of 16 months' incarceration should provide a measure of deterrence against future criminal conduct by the defendant.

      C.    <u>Need to Protect the Public from the Defendant's Future Criminal Conduct</u>

Similarly, sentencing MITCHELL to the recommended sentence will protect the public from the defendant's future criminal conduct.

      D.    <u>Need to Provide Needed Treatment to Defendant</u>

The United States is not aware of any treatment needs the defendant may have that would have any bearing on determining an appropriate sentence for him.

**V.    Conclusion**

For the foregoing reasons, the United States respectfully asks this Court, after considering the appropriate guideline range and the factors under 18 U.S.C. § 3553, to sentence the defendant to 16 months of incarceration and an appropriate fine and restitution.

Respectfully submitted,

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: _____/s/_____
Brian R. Hood
Assistant United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Phone (804) 819-5508
Brian.hood@usdoj.gov

CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Position of the United States with Respect to Sentencing was sent on this day, **March 17, 2010**, by electronic mail to the following:

>William J. Dinkin
>Dinkin & Purnell, PLLC
>One E. Cary St., Suite 201
>Richmond, VA 23219
>Email: wjdinkin@dinkinandpurnell.com
>
>*and*
>
>David S. Simon
>U.S. Probation Office
>701 E. Broad Street, Suite 1150
>Richmond, VA 23219
>Email: David_S_Simon@vaept.uscourts.gov

By: ____/s/_____
Brian R. Hood
Assistant United States Attorney
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Phone (804) 819-5508
Brian.hood@usdoj.gov